## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADREA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 10-600-ER |
| v. | ) | (Consolidated) |
| | ) | |
| AMAZON.COM, INC., | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| AMAZON.COM, INC. | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ADREA, LLC, DISCOVERY | ) | |
| COMMUNICATIONS, INC., DISCOVERY | ) | |
| COMMUNICATIONS, LLC, and THE | ) | |
| DISCOVERY CHANNEL STORE, INC., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

### DEFENDANT AND COUNTERCLAIM PLAINTIFF AMAZON.COM, INC.'S AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF <u>CLAIMS 39 AND 40 OF U.S. PATENT NO. 5,986,690</u>

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt
Y. Ernest Hsin
Sarah E. Piepmeier
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000

Mark Reiter
2100 McKinney Avenue
Dallas, TX 75201-6912
Tel: (214) 698-3100

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Amazon.com, Inc.*

Dated: December 16, 2010
993745 / 34137

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................ 1

II. STATEMENT OF MATERIAL FACTS ........................................................................ 2

    A.    The '690 Patent ........................................................................................ 2

    B.    The Prodigy Interactive Personal Service ................................................ 4

        1.    Overview of Prodigy ........................................................................ 5

        2.    Accessing Prodigy's Content ........................................................... 6

        3.    Menu-Based Graphical User Interface .............................................. 7

        4.    Selecting and Receiving Prodigy's Content ..................................... 9

            a)    Newsroom ............................................................................. 9

            b)    Software Guide ..................................................................... 12

            c)    Encyclopedia ........................................................................ 13

            d)    Parenting Guide ................................................................... 14

        5.    Delivery of Selected Content to Subscribers .................................. 15

III. ARGUMENT ........................................................................................................ 15

    A.    Summary Judgment of Invalidity Is Appropriate and Routinely Granted ........... 15

        1.    Invalidity Based on Anticipation .................................................... 16

        2.    Summary Judgment of Anticipation ............................................... 16

    B.    Prodigy Invalidates Claims 39 and 40 of the '690 Patent .................................. 17

        1.    Prodigy Is Prior Art to the '690 Patent ........................................... 17

        2.    Prodigy Anticipates Claim 39 ........................................................ 18

            a)    Prodigy Satisfies Claim 39's Preamble ............................... 18

                (a)    The Prodigy Service Satisfies Claim 39's Preamble ....... 18

                (b)    The *Prodigy Official Guide* Describes Claim 39's Preamble .............................................. 20

**Table of Contents**
**(Continued)**

Page

b)     Prodigy Created a List of Titles of Available Books
       (Step 1)................................................................................21

       (a)     The Prodigy Service Created a List of Titles of
               Available Books.................................................22

       (b)     The *Prodigy Official Guide* Describes Creating a
               List of Titles of Available Books.....................................23

c)     Prodigy Transmitted the List of Titles of Available Books
       (Step 2).......................................................................23

       (a)     The Prodigy Service Transmitted the List of Titles
               of Available Books ........................................................23

       (b)     The *Prodigy Official Guide* Describes Transmitting
               the List of Titles of Available Books...............................24

d)     Prodigy Permitted Selection of Titles from Transmitted List
       of Titles (Step 3) .....................................................25

       (a)     The Prodigy Service Provided Selection of a Title
               from the Transmitted List of Titles.................................25

       (b)     The *Prodigy Official Guide* Describes Selecting a
               Title from the Transmitted List of Titles ........................27

e)     Prodigy Communicated the Selected Title to Text Source
       (Step 4)......................................................................27

       (a)     Selected Titles Were Communicated to the Text
               Source in the Prodigy Service.........................................28

       (b)     *The Prodigy Official Guide* Describes
               Communicating Selected Titles to the Text Source.........28

f)     Prodigy Transmitted the Text Associated with the Selected
       Title from the Text Source to the Viewing Location
       (Step 5).......................................................................29

       (a)     The Prodigy Service Transmitted the Text
               Associated with the Selected Title from the Text
               Source to the Viewing Location .....................................29

**Table of Contents**
**(Continued)**

Page

(b)   *The Prodigy Official Guide* Describes Transmitting Text Associated with the Selected Title from the Text Source to the Viewing Location ............................. 30

3.   Prodigy Anticipates Claim 40 ................................................. 31

a)   Prodigy Generated Menu that Listed Categories of Available Books (Step 1) ............................................ 32

(a)   The Prodigy Service Generated a Menu that Listed Categories of Available Books ....................................... 32

(b)   The *Prodigy Official Guide* Describes Generating a Menu that Listed Categories of Available Books ........... 33

b)   Prodigy Provided Choosing a Category of Available Books from the Generated Menu (Step 2) ............................. 33

(a)   The Prodigy Service Provided Choosing a Category of Available Books from the Generated Menu ............... 33

(b)   *The Prodigy Official Guide* Describes Choosing a Category of Available Books from the Generated Menu ...................................................................... 33

c)   Prodigy Listed Books within Chosen Category of Available Books (Step 3) ............................................ 34

(a)   The Prodigy Service Listed Books within the Chosen Category of Available Books ............................. 34

(b)   *The Prodigy Official Guide* Describes Listing Books within the Chosen Category of Available Books ......................................................................... 35

IV. CONCLUSION ...................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

# Cases

*Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.,*
731 F.2d 831 (Fed. Cir. 1984) ................................................. 17

*Golden Bridge Tech., Inc. v. Nokia, Inc.,*
527 F.3d 1318 (Fed. Cir. 2008) ............................................... 17

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
424 F.3d 1374 (Fed. Cir. 2005) ............................................... 16

*Iovate Health Scis., Inc. v. Bio-Engineered Supplements & Nutrition, Inc.,*
586 F.3d 1378 (Fed. Cir. 2009) ........................................... 16, 17

*King Pharmaceuticals, Inc. v. Eon Labs, Inc.,*
616 F.3d 1267 (Fed. Cir. 2010) ............................................... 17

*Microstrategy Inc. v. Business Objects Americas*
410 F. Supp. 2d 348 (D. Del. 2006) ......................................... 17

*Netscape Communications Corp. v. Konrad,*
295 F.3d 1315 (Fed. Cir. 2002) ............................................... 16

*Rocep Lusol Holdings, Ltd. v. Permatex, Inc.,*
470 F. Supp. 2d 448 (D. Del. 2007) ......................................... 17

*Smithkline Beecham Corp. v. Geneva Pharmaceuticals,*
2002 U.S. Dist. LEXIS 25275 (E.D. Pa. Dec. 20, 2002) ................. 17

*The Procter & Gamble Co. v. Nabisco Brands, Inc.,*
711 F. Supp. 759 (D. Del. 1989) ............................................. 17

*WMS Gaming, Inc. v. Int'l Game Tech.,*
184 F.3d 1339 (Fed. Cir. 1999) ............................................... 16

# Statutes

35 U.S.C. § 102(b) ................................................................ 16

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff and Counterclaim Defendant Adrea LLC ("Adrea") asserts that Defendant and Counterclaim Plaintiff Amazon.com, Inc. ("Amazon") infringes two patents.  This motion for summary judgment of invalidity focuses on the first of those patents – U.S. Patent No. 5,986,690 ("the "'690 patent").  As demonstrated below, the two asserted claims of the '690 patent are clearly and convincingly invalid.

As the Court may recall from the claim construction proceedings, in general terms, the two asserted claims of the '690 patent – claims 39 and 40 – relate to the creation of a list of available books and the transmission of a book that is selected from that list.  These claims are invalid under 35 U.S.C. § 102(b) because more than one year prior to the '690 patent's November 7, 1994 filing date, numerous systems were in public use throughout the country that did exactly what the claims of the '690 patent require.  While those many prior art systems invalidate '690 claims 39 and 40, this motion for summary judgment focuses on just one of those systems: a computer network called the Prodigy Interactive Personal Service ("Prodigy").

There is no dispute that years prior to the November 1994 filing date, Prodigy had over one million subscribers in the United States.  And, as demonstrated below in detail, the evidence clearly shows that Prodigy publicly implemented the methods of claims 39 and 40 of the '690 patent.  Specifically, Prodigy enabled subscribers to electronically browse, select, and receive a huge variety of magazine, news, and other types of articles and texts (as claimed in claim 39), and Prodigy organized those texts into categories and used menus to display the various categories (as claimed in claim 40).  In fact, in its discovery responses, Adrea does not even dispute that Prodigy performs nearly all of the elements of the asserted claims.  The Prodigy system, therefore, invalidates claims 39 and 40.

Not only does the Prodigy system invalidate the asserted claims of the '690 patent, but texts describing the Prodigy system do so as well.  Given the popularity and wide-spread use of Prodigy, numerous publications (including instructional texts) were written about the system before November 1994.  These publications described in detail the features and functionality of

Prodigy.  One such text published in 1991 was *The Official Guide to the Prodigy Service* (the "*Prodigy Official Guide*").  The *Prodigy Official Guide* describes the Prodigy service, explains how to use that service, and discloses each of the elements of '690 patent claims 39 and 40.  The *Prodigy Official Guide*, thus, independently renders the asserted claims invalid.

There is no genuine dispute regarding the functionality of Prodigy – both in the actual Prodigy system and in the *Prodigy Official Guide* describing it – or that Prodigy disclosed the asserted claims of the '690 patent.  Indeed, prior to filing this motion, Amazon detailed for Adrea how Prodigy and its associated literature invalidated the asserted '690 patent claims.  Given the clarity of this evidence, Adrea has lacked a good faith basis to assert the patent, and should have withdrawn its claims, as Amazon repeatedly urged Adrea to do.[1]  Unfortunately, Adrea refused, necessitating this motion for summary judgment.

Amazon thus respectfully requests that the Court grant summary judgment that claims 39 and 40 are invalid and enter any other relief appropriate in light of Adrea's continued assertion of an invalid patent.

## II.  STATEMENT OF MATERIAL FACTS

### A.    The '690 Patent

The application that resulted in the '690 patent was filed on November 7, 1994.  The parties agree that the two asserted claims – claims 39 and 40 – are entitled to a priority date of November 7, 1994.[2]  Systems and publications, such as the Prodigy system and literature about Prodigy, that pre-date November 7, 1994 by more than one year constitute prior art under 35 U.S.C. § 102(b).

Claims 39 and 40 of the '690 patent disclose methods relating to the selection and delivery of "electronic books."  *See* Hsin Decl. ¶ 2 Ex. 1 at 25:1-40:10.  As discussed below, the

---

[1] Correspondence between the parties on this issue is attached to the Declaration of Y. Ernest Hsin ("Hsin Decl.") as Exhibits 2 to 5.

[2] Hsin Decl. ¶ 7 Ex. 6, Response to Interrogatory No. 18.

parties agree that "electronic books" include more than books in the traditional sense, but cover "electronic text and graphics," such as in electronic versions of magazine and newspaper articles. Indeed, both claims set forth steps directed to the selection and receipt of "electronic books" at a "viewing location."

More specifically, claim 39 requires the basic steps of (1) creating a list of titles of available electronic text, *i.e.,* text available for transmission, (2) transmitting that list of titles, (3) selecting a title from the list, (4) communicating the selection to the text source, and (5) transmitting the text associated with the title to a viewing location. Even on closer inspection, there is little more to the claim, which is reproduced below:

> 39.  A method for receiving selected text upon demand at a viewing location wherein text is associated with an available book title and a text source stores the text, comprising:
>
> [1] creating a list of titles of available books wherein a book is available if the text associated with the book is available for transmission;
>
> [2] transmitting the list of titles of available books;
>
> [3] selecting a title from the transmitted list of titles;
>
> [4] communicating the selected title to the text source;
>
> [5] transmitting the text associated with the selected title from the text source to the viewing location.

The specific steps of the method are all straight-forward.

Dependent claim 40 adds little more and simply requires that the list of available books be categorized such that the subscriber can choose, from a menu, a category of available books. Within the chosen category, there appears a list of available books. Claim 40 provides:

> 40.  The method of claim 39 wherein the titles of available books are categorized, and the step of selecting a title comprises:
>
> [1] generating a menu which lists categories of available books;
>
> [2] choosing a category of available books from the generated menu;
>
> [3] listing books within the chosen category of available books.

Like claim 39, the steps of claim 40 are also straightforward.

As noted above, it is important to understand that the parties agree that in the context of the '690 patent the term "books" encompasses books as well as other textual or graphical

information contained in articles in encyclopedias, magazines, and newspapers, as well as in catalogues, periodicals and manuals.[3]   In other words, the claims of the '690 patent are not limited to books as such, but to a much broader set of electronic text and graphics.

## B.      The Prodigy Interactive Personal Service

By 1993, many interactive, online services were operating and available to the public. These services ranged from specialized research services such as Westlaw and Lexis to more general services that focused on personal users, such as CompuServe and America Online.  This motion centers around one of the general services – the Prodigy Interactive Personal Service.

Prodigy was an early interactive, online service launched in 1988.  *See* Declaration of Norman L. Dawley[4] ("Dawley Decl.") ¶ 6; Declaration of John L. Viescas[5] ("Viescas Decl.") ¶ 7, Ex. 2.  Prodigy offered its subscribers a wide range of networked features, including access to news, shopping, games, banking, travel, and many other services.  By 1991 Prodigy was available nation-wide, "offer[ing] a huge array of information, presented in an easy-to-use and entertaining format, to more than a million owners of personal computers and their families." Viescas Decl. ¶¶ 7, 11, Ex. 2 at ix; Dawley Decl. ¶¶ 5-6.  As noted earlier, Prodigy's broad appeal inspired several books that taught Prodigy subscribers how to use the system and described Prodigy's many features; one such book was *The Official Guide to the Prodigy Service* published in 1991.  *See* Viescas Decl. ¶¶ 5, 7, Ex. 2.

---

[3]  *See* D.I. 93, Plaintiff Discovery Communications, Inc.'s Opening Claim Construction Brief for U.S. Patent Nos. 5,896,690 and 7,298,851 at 5-8; D.I. 114, Amazon's Responsive Claim Construction Brief at 11-14, 34.

[4]  Norman Dawley worked for Prodigy between 1984 and 1996 and was responsible for developing features, infrastructure and functionality for Prodigy; in 1994, Mr. Dawley was named Vice-President of Development.  Dawley Decl. ¶ 2.

[5]  John Viescas wrote the book *The Official Guide to the Prodigy Service* in or about 1990.  Mr. Viescas wrote the book based on his actual use of Prodigy as well as discussions and meetings with Prodigy engineers and developers.  Viescas Decl. ¶¶ 5-8.

1.      **Overview of Prodigy**

As an interactive system, Prodigy provided its subscribers with numerous ways in which they could identify and select the varied content offered by Prodigy.  As explained more fully below, Prodigy used a graphical interface through which subscribers interacted with the service. As Figure 2-30 from the *Prodigy Official Guide* shows (all of the figures from the *Prodigy Official Guide* are actual screen shots taken by Mr. Viescas, *see* Viescas Decl. ¶ 6), that interface contained categories of information and services.  Subscribers could choose a category, such as "Computers," "Business," or "Weather," and navigate to the Prodigy page or pages associated with the selected subject matter.



**Figure 2-30.**
*Inside the PRODIGY Service screen.*

Viescas Decl. ¶ 30, Ex. 2 at 59.  Once a subscriber arrived at a page of interest, for example, Prodigy's "Software Guide," Prodigy permitted the subscriber to search for articles and presented to the subscriber a list of titles of articles that were available for the subscriber to receive at his or her personal computer.  *Id.* at ¶¶ 30-52, Ex. 2 at 43-46, 139-45, 156-58, 297.



**Figure 4-27.**
*Entertainment software reviews.*

5

Figure 4-27 above demonstrates that the list of titles of available articles, such as "Kings of the Beach" or "Microsoft Flight Simultr (3.0)", was transmitted to the subscriber's personal computer, *i.e.,* "viewing location." *Id.* at ¶¶ 40-41, Ex. 2 at 140-41. Through Prodigy's interactive interface, one or more of the article titles could be selected, and that selection was transmitted to Prodigy's main computer complex (the "Prodigy mainframe") on which the text associated with the listed titles was stored. *Id.* After a title was selected, Prodigy transmitted the text associated with the title from the Prodigy mainframe to the subscriber's personal computer, *i.e.,* "viewing location," as Figure 4-28 (showing the transmitted text of an article) illustrates.



**Figure 4-28.**
*Software Guide article.*

*Id.* Thus, Prodigy – like the asserted claims of the '690 patent – (1) created a list of titles of available text, (2) transmitted that list of titles to subscribers, (3) permitted the selection of a title from the list, (4) transmitted the selected title to the Prodigy mainframe where the text was stored, and, finally (5) transmitted the text associated with the title to the subscriber's viewing location – his or her personal computer.

Using both the way in which subscribers interacted with Prodigy, as well as the disclosures provided in the *Prodigy Official Guide*, below we provide a detailed description of the Prodigy service, its interface, content, and operation relevant to the elements of claims 39 and 40 of the '690 patent.

## 2. Accessing Prodigy's Content

In order to access Prodigy's content at a "viewing location," Prodigy subscribers used their personal computers to dial into the Prodigy network and log in with a user ID and

password.  *Id.* at ¶¶ 12, 25.  Once logged in, Prodigy displayed to the subscribers a "Highlights" screen that presented the latest news and provided subscribers with access to the various features and services offered by Prodigy.  *Id.* at ¶¶ 5, 12-20, 25-27, Ex. 2 at 20-29, 121.



**Figure 4-1.**
*March 25, 1991, Highlights screen.*

As Figure 4-1 illustrates, the Highlights screen displayed a menu of categories of available content.  *Id.*  From the Highlights screen a Prodigy subscriber could navigate to pages that listed various publications, such as magazines and encyclopedias, as well as pages that listed titles of articles available from those publications.  *Id.* at ¶¶ 5, 27, Ex. 2 at 28-29.  From those lists of articles, the Prodigy subscriber could select particular articles of interest for transmission to his or her personal computer.  *Id.* at ¶¶ 5, 21-30, Ex. 2 at 33-34, 43-46, 140; Dawley Decl. ¶¶ 10-14.

### 3.   Menu-Based Graphical User Interface

As the Highlights screen above, shows, Prodigy provided a user-friendly, menu-based graphical user interface.  Viescas Decl. ¶¶ 5, 21-30, Ex. 2 at 33-34, 43-46, 140.  For example, and as detailed in the *Prodigy Official Guide,* from the "Highlights" screen,  subscribers could press the "G" key on his or her keyboard, which caused Prodigy to display a "JUMPwindow" containing a menu of possible selections.





**Figure 2-9.**
*Guide command.*



**Figure 2-11.**
*Guide pop-up: Newsroom, Area News.*

*Id.* at ¶¶ 5, 28-29, Ex. 2 at 42-43.  As shown in the figures above, when a subscriber selected "Guide" from the JUMPwindow menu, a separate "Guide" menu appeared, which provided the subscriber with another menu that listed categories of topics of available articles, such as "News & Features," "Living," "Shopping," "Travel," and "Computers."  *Id.*  If the subscriber selected the "News & Features" category from the "Guide" menu, Prodigy displayed yet another menu that contained a list of news-related options available to the subscriber.  *Id.* at ¶¶ 21-24, 28, Ex. 2 at 42-46; Dawley Decl. ¶¶ 10-14.  The subscriber could then select one of the options in that menu to continue to the feature of interest.  *Id.*

Given the many different categories of content and services, Prodigy offered subscribers a number of different ways to navigate around the system.  In addition to the "Guide" menu, Prodigy included an "Inside the Prodigy Service" screen, which permitted subscribers to explore "the most recently added and changed features on the service" by choosing from a menu of subjects available to them.



**Figure 2-30.**
*Inside the PRODIGY Service screen.*

8

Viescas Decl. ¶¶ 5,30, Ex. 2 at 59.  From this screen, a subscriber could choose to view another menu in a selected area of interest.  *Id.*  Prodigy thus used this menu-based system to direct subscribers to pages that contained lists of titles of available articles that the subscribers could select for download to their personal computers.  As explained below, Prodigy's menu-based system and topical organization match exactly the requirements of '690 claim 40.

### 4.    Selecting and Receiving Prodigy's Content

As the "Inside the Prodigy Service" screen of Figure 2-30 above illustrates, Prodigy provided access to an immense amount of content.  *Id.* at ¶¶ 5, 30-31, Ex. 2 at 59.  This content included a variety of articles and publications categorized by topic.  Indeed, under the menu for "News & Features" (shown above in Fig. 2-11), Prodigy organized available articles by categories including the "Newsroom," "Business," "Sports," "Weather," "Consumer," and "Extra Extra."  *Id.* at ¶¶ 5, 32-34, Ex. 2 at 43-46.  Within each category, subscribers could select articles of interest.  For instance, as one would expect, under the "Newsroom" category, subscribers could select from article categories such as "Headlines," "Area news," or "Science news."  *Id.*  Prodigy also included online magazines such as *Consumer Reports* and *Kiplinger's Personal Finance* as well as an online encyclopedia – *Academic American Encyclopedia* – from which subscribers could select additional articles.  *Id.* at ¶¶ 5, 31-34, Ex. 2 at 157, 242-44, 297; Dawley Decl. ¶ 13.

Further description regarding certain of the categories of available articles follows, which relates to (1) claim 39's requirement that a list of titles of available text be transmitted so that a title corresponding to available text could be selected and (2) claim 40's requirement that the text be categorized and that those categories be available for selection.

### a)    Newsroom

The "Newsroom" "is where [subscribers could] choose to read the headlines, find out what's happening in [their] area or other regions across the country," and generally catch up on news of interest.  Viescas Decl. ¶¶ 5, 32, Ex. 2 at 43-46, 121, Ex. 3 at 105.  The Newsroom provided continuous, live, up-to-date coverage of world events and included content gathered

from multiple media outlets, such as *USA Today,* the *Associated Press, Dow Jones, and Tribune Media. Id.* at ¶¶ 5, 32, Ex. 2 at 43-46, 121.



**Figure 2-11.**
*Guide pop-up: Newsroom, Area News.*

As Figure 2-11 illustrates, and as required by claim 40, the Newsroom was organized by various categories, such as "Area News," which allowed subscribers to look at news and events organized by metropolitan areas. *Id.* at ¶¶ 5, 34, Ex. 2 at 43-46. Each of the Newsroom's top-level categories typically had sub-categories. The "Area News" category, for example, organized news articles by the region to which they pertained and even by cities within each region. *Id.* at ¶¶ 5, 34-36, Ex. 2 at 43-46. Once a subscriber chose a category of interest from the Newsroom menus, he or she could select from various titles of available articles and have the article transmitted to his or her personal computer. *Id.* at ¶¶ 34-37, Ex. 2 at 43-46. As explained in the Argument section below, the transmission of this categorized list of titles and the selection from among that list equate to the steps of "creating a list of titles …," "transmitting the list of titles …," and "selecting a title from the transmitted list …," as claim 39 requires, as well as "generating a menu which lists categories of available books . . .," "choosing a category of available books . . .," and "listing books within the chosen category of available books," as claim 40 requires.

The *Prodigy Official Guide* explains how to navigate through Prodigy's Newsroom. Indeed, as the reproduced text and figures from the *Prodigy Official Guide* demonstrate, the *Prodigy Official Guide* takes a subscriber from the Newsroom to specific, available articles related to the Los Angeles area:

In the Newsroom menu, a selection titled Area News looks interesting.  Move down to that selection, as shown in Figure 2-11, and press Enter.  You are now in the Area News section (not shown here).  Select the CITIES box on that screen, and you'll first see a pop-up menu in which you can select the area of the country, as shown in Figure 2-12.

 

**Figure 2-12.**
*Area News pop-up menu.*

**Figure 2-13.**
*West area cities pop-up menu.*

You're interested in Los Angeles, so use Tab to move the highlight down to the West selection and press Enter, or double-click with your mouse.  This opens up the West cities pop-up menu to allow you to select Los Angeles, as shown in Figure 2-13. . . . The next screen you see is a numbered selection list of all the types of information available about Los Angeles, as shown in Figure 2-14.

 

**Figure 2-14.**
*Los Angeles area information list.*

**Figure 2-15.**
*West area news menu.*

Selecting items from this type of list is similar to selecting the numbered selections on the main Highlights screen – you select the item you want by pressing its number and then pressing Enter.  You also can use the Tab or arrow keys or the mouse to make a selection. . . . .Check out West News to see what's going on these days.  As you can see in Figure 2-15, on the day I looked, the top story was about a rare condor at the Los Angeles Zoo.  Of course, when you look here, you'll see a different list, but the items will be numbered for easy selection.

*Id.* at Ex. 2 at 43-46.  Figures 2-12 to 2-15 from *The Prodigy Official Guide* thus provide an

illustration of navigating through Prodigy and selecting the "West" region from the "Area News"

menu, selecting "Los Angeles" from the West region menu, selecting "West News" from the Los

Angeles menu, and finally displaying to the subscriber a list of available article titles.  *Id.*  As is

clear in the *Prodigy Official Guide,* when the subscriber typed the number corresponding to the story he or she wanted to read and pressed "Enter," Prodigy sent the text of the article to the subscriber's computer so that the full story could be read.  *Id.* at ¶ 5, Ex. 2 at 6-7, 9, 43-46, Figs. 2-15, 2-16.  In the words of claim 39, Prodigy "transmitted the text associated with the selected title from the text source to the viewing location."

### b)   Software Guide

Another place where Prodigy created a list of titles, transmitted that list of titles, allowed selection from among the list, and returned the text associated with the title, as required by claim 39, was Prodigy's "Software Guide."  This Guide provided subscribers with access to software review articles that had been published in *Home Office Computing* magazine since April 1988. *Id.* at ¶¶ 5, 38, Ex. 2 at 139.

When a subscriber selected the Software Guide*, he or she could choose to view a list of titles of Software Guide articles or search for particular articles using search terms.  *See id.* at ¶¶ 5, 38-41, Ex. 2 at 139-41.  Once the subscriber had set the search criteria, he or she would select the option "LIST SELECTED TITLES" on the menu, which would prompt Prodigy to return "a list of available articles for software that meets [the subscriber's][search] criteria, similar to the list shown in Figure 4-27."  *Id.* at ¶¶ 5, 39-40, Ex. 2 at 140.



**Figure 4-25.**
*Software Guide menu.*



**Figure 4-27.**
*Entertainment software reviews.*

The subscriber could then scroll through the list and select an article to be transmitted from the Prodigy mainframe as shown in Figure 4-28.  *Id.* at ¶¶ 39-41, Ex. 2 at 140-41.



**Figure 4-28.**
*Software Guide article.*

### c) Encyclopedia

In addition to news and feature articles, Prodigy offered an online encyclopedia. By 1991, the encyclopedia included more than 33,000 individual articles. *Id.* at ¶ 42, Ex. 2 at 156; Dawley Decl. ¶ 13, Ex. 1 at 117. The encyclopedia was updated approximately every three months. Viescas Decl. ¶ 42, Ex. 2 at 156. As with the Newsroom and Software Guide, when a subscriber visited the encyclopedia, Prodigy created a list of titles, transmitted that list of titles, allowed selection from among the list, communicated the selection to the Prodigy mainframes, and returned the text associated with the title, as required by claim 39.

Figure 4-45 below shows how a subscriber could search for articles by typing an "article name" or subject, such as "dickinson," *i.e.,* for the poet Emily Dickinson, in a text box. *Id.* at ¶¶ 43-44, Ex. 2 at 156-57; *see also* Dawley Decl. ¶¶ 13-14, Ex. 1 at 117-18. Figure 4-46, also reproduced below, shows that Prodigy then displayed to the subscriber a list of available article titles that included the name "Dickinson." Viescas Decl. ¶ 44, Ex. 2 at 157-59.



**Figure 4-45.**
*Encyclopedia main selection.*



**Figure 4-46.**
*Encyclopedia article list.*

13



└─ See Table of Contents for this article

**Figure 4-47.**
*Emily Dickinson article.*

When the subscriber selected the article title of interest – by highlighting it using the up and down arrow keys on the keyboard and pressing ENTER or double-clicking on it with a mouse – Prodigy transmitted the article to the subscriber's home computer for review, as Figure 4-47 shows. *Id.* at ¶ 43, Ex. 2 at 157 ("When you see the article you want, highlight it and press Enter, or double-click with your mouse, to see the article.").

### d)   Parenting Guide

Yet another place where Prodigy generated a menu of categories of titles of available articles, allowed selection from that menu and transmitted that selection to the Prodigy mainframe, and then created a list of titles in the chosen category from which a selection was made and communicated to the Prodigy mainframe, after which it returned the text associated with the title, as required by claims 39 and 40, occurred in Prodigy's "Parenting Guide," which provided Prodigy's subscribers with access to a collection of more than 600 articles categorized by topic, such as pregnancy, newborn, infant, toddler, etc. *Id.* at ¶ 45, Ex. 2 at 142-43.  By navigating through available topical categories, as well as the sub-categories, the Prodigy subscriber could view a list of titles of available articles relating to a specific, selected topic.  As Figure 4-32 demonstrates, one such sub-category – "Behavioral Information" – included several articles available for transmission to the subscriber. *Id.*  If, for example, the subscriber selected the title "Allowances," the corresponding article, as shown in Figure 4-33, was transmitted to and displayed on the subscriber's personal computer.

14



**Figure 4-32.**
*Pre-Teen behavioral information articles.*

└─ Return to Parenting Topics window



**Figure 4-33.**
*Allowance advice.*

*See id.* at ¶¶ 45-48, Ex. 2 at 144.

5.      **Delivery of Selected Content to Subscribers**

In the use of Prodigy, just as required by claim 39, the selected title was transmitted to the text source (Prodigy's mainframe), and then the text associated with the selected title was transmitted to a viewing location (the subscriber's personal computer).  Indeed, once a subscriber selected an article, the subscriber's computer would communicate that selection to the Prodigy mainframe so that Prodigy could transmit the menu or article text associated with the selection to the subscriber's personal computer.  Dawley Decl. ¶¶ 7-9; Viescas Decl. ¶¶ 12-20, Ex. 2 at 6-7, 9, 22 ("To be able to use the PRODIGY service, your computer has to be hooked up through your modem and phone line to the PRODIGY service's computer network.").

## III.  ARGUMENT

### A.      Summary Judgment of Invalidity Is Appropriate and Routinely Granted

No genuine issue of material fact exists regarding the features and functionality of the Prodigy service relevant to the asserted claims of the '690 patent.  Because each of the elements of those claims was publicly available in the Prodigy service and, separately, also described in the *Prodigy Official Guide* more than one year prior to the filing of the '690 patent, those claims are anticipated and invalid under 35 U.S.C. § 102(b).

The absence of any genuine issue of fact is highlighted by Adrea's response to an interrogatory that asked Adrea to explain why it contends Prodigy does not anticipate '690 patent claims 39 and 40.  Adrea did not challenge Prodigy's date or status as prior art.  In fact, Adrea

did not dispute that Prodigy discloses most of the elements of claims 39 and 40; instead, without explanation, Andrea identified just two claim elements as not explicitly disclosed by Prodigy.[6]  As demonstrated below, Prodigy performed and disclosed every step of claims 39 and 40.

### 1. Invalidity Based on Anticipation

A patent claim is anticipated and invalid if the subject matter of the claim was "described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).  First, "[t]o qualify as a printed publication, [a reference] must have been disseminated or otherwise made accessible to persons interested and ordinarily skilled in the subject matter to which the [reference] relate[s] prior to the critical date."  *Iovate Health Scis., Inc. v. Bio-Engineered Supplements & Nutrition, Inc.,* 586 F.3d 1378, 1380 (Fed. Cir. 2009).  Second, to anticipate under the public use or on sale prong of § 102(b), the "proper test . . . is whether the purported use: (1) was accessible to the public; or (2) was commercially exploited."  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005); *see also Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (affirming grant of summary judgment of invalidity under § 102(b)).

Significantly, Prodigy was not a prior art reference considered by the examiner during prosecution of the '690 patent claims.  The Federal Circuit has emphasized that the burden of proving invalidity is more easily met where, as here, the prior art upon which a validity challenge is premised was not before the PTO during prosecution.  *See*, *e.g.*, *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

### 2. Summary Judgment of Anticipation

Summary judgment of anticipation is routinely granted when, as in this case, there is no genuine dispute that a prior art reference discloses the elements of a patent claim.  *See, e.g.,*

---

[6] *See* Hsin Decl. ¶ 4 Ex. 3 [Discovery Communication, Inc.'s Response to Defendant Amazon.com, Inc.'s Fourth Set of Interrogatories, served August 2, 2010], Response to Interrogatory No. 19.

*Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed. Cir. 1984) ("Summary judgment is as appropriate in a patent case as in any other."); *King Pharmaceuticals, Inc. v. Eon Labs, Inc.,* 616 F.3d 1267 (Fed. Cir. 2010) (affirming summary judgment that all claims of two asserted patents were invalid as anticipated under 35 U.S.C. § 102(b)); *Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.,* 586 F.3d 1376 (Fed. Cir. 2009) (affirming a grant of summary judgment that asserted patent claims were anticipated under 35 U.S.C. § 102); *Golden Bridge Tech., Inc. v. Nokia, Inc.,* 527 F.3d 1318, 1321 (Fed. Cir. 2008) (appropriate to decide anticipation under 35 U.S.C. § 102); *Rocep Lusol Holdings, Ltd. v. Permatex, Inc.,* 470 F. Supp. 2d 448 (D. Del. 2007) (granting a motion for summary judgment of invalidity under 35 U.S.C. § 102(b)); *Microstrategy Inc. v. Business Objects Americas,* 410 F. Supp. 2d 348, 362-65 (D. Del. 2006) (granting summary judgment of invalidity for anticipation under 35 U.S.C. § 102(b)); *Smithkline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 2002 U.S. Dist. LEXIS 25275 (E.D. Pa. Dec. 20, 2002) (granting summary judgment of anticipation and invalidity); *The Procter & Gamble Co. v. Nabisco Brands, Inc.,* 711 F. Supp. 759, 762-73 (D. Del. 1989) (granting a motion for summary judgment that a patent claim was invalid as anticipated).

## B.     Prodigy Invalidates Claims 39 and 40 of the '690 Patent

### 1.     Prodigy Is Prior Art to the '690 Patent

There is no dispute that the Prodigy system and the *Prodigy Official Guide* both constitute prior art for the purposes of invalidity.  Prodigy's operation, user interface, and features relevant to claims 39 and 40 of the '690 patent were in public use by November 6, 1993 – one year before the filing of the '690 patent application.  *See* Viescas Decl. at ¶ 11, Dawley Decl. ¶¶ 5-6.  Prodigy's features and functionality were also described in the *Prodigy Official Guide to the Prodigy Service* published in 1991.[7]  *See* Viescas Decl. ¶¶ 5, 12-52, Ex. 2.  Thus,

---

[7] Prodigy's operation, user interface, and features were also described in the 1991 publication *Prodigy Made Easy,* the second edition of which was published in 1993.  *See* Viescas Decl. ¶¶ 9-10, Ex. 3-4; Dawley Decl. ¶¶ 10-14, Ex. 1; Hsin Decl. ¶ 8, Ex. 7-8.

both the Prodigy service and the *Prodigy Official Guide* are prior art to the '690 patent.

## 2.      Prodigy Anticipates Claim 39

The features and functions of Prodigy described above clearly and convincingly demonstrate that Prodigy practiced each of the steps of '690 patent claim 39 and thus anticipates claim 39 under the public use portion of § 102(b).  Additionally, *The Prodigy Official Guide* described and disclosed each element of claim 39 and thus anticipates claim 39 under the printed publication portion of § 102(b).

### a)      Prodigy Satisfies Claim 39's Preamble[8]

The preamble of claim 39 recites a "method for receiving selected text upon demand at a viewing location wherein text is associated with an available book title and a text source stores the text."  In its discovery responses, Adrea did not dispute that Prodigy satisfies the preamble of claim 39.

#### (a)      The Prodigy Service Satisfies Claim 39's Preamble

The Prodigy service implemented each of the elements of the preamble.  When using the Prodigy service, Prodigy subscribers selected and received, at their personal computers, text associated with an available book title stored on the Prodigy mainframe.  *See* Dawley Decl. ¶¶ 7-8, 10-14; Viescas Decl. ¶¶ 13-16, 18, 21-24.

First, the preamble requires the receipt of selected text on demand at a viewing location.  As explained above, the subscribers' personal computers constituted the "viewing location."  Prodigy subscribers, moreover, received the text "upon demand."  Dawley Decl. ¶¶ 11-12; Viescas Decl. ¶¶ 16-17, 22-24.  Prodigy did not predict what text was desired by a subscriber.  Rather, Prodigy only sent text that had been selected – *i.e.,,* demanded – by a subscriber.  Dawley Decl. ¶¶ 11-12.  This point is demonstrated by Prodigy's Software Guide.  As annotated

---

[8]  For purposes of this motion, Amazon has assumed that the preambles of claims 39 and 40 constitute claim elements.

Figures 4-27 and 4-28 show, the text of the "Microsoft Flight Simultr 3.0" article was received at a viewing location – the subscriber's personal computer – after it was selected, *i.e.,,* demanded.



**Figure 4-27.**
*Entertainment software reviews.*



**Figure 4-28.**
*Software Guide article.*

These figures also demonstrate that "text is associated with an available book title." The title is shown in Figure 4-27 and the text associated with the article is shown in Figure 4-28. Viescas Decl. ¶¶ 16-17, 22-24; Dawley Decl. ¶¶ 11-12.

Next, the preamble requires "text associated with an available book title." The parties agree that a "book" includes at least "the textual or graphical information contained in a work such as a novel, encyclopedia, article, magazine, newspaper, catalogue, periodical, or manual." In other words, the parties agree that for purposes of the claims of the '690 patent, the term "book" includes magazine, news, and encyclopedia articles.[9] Referring again to Figure 4-27, the

---

[9] *See* D.I. 93, Plaintiff Discovery Communications, Inc.'s Opening Claim Construction Brief for U.S. Patent Nos. 5,896,690 and 7,298,851 at 5-8; D.I. 114, Amazon's Responsive Claim Construction Brief at 11-14, 34; Transcript of May 21, 2010 Markman Hearing at 14-19, 37-40.

title "Microsoft Flight Simultr 3.0" constitutes but one example of an "available book title" in Prodigy, and Figure 4-28 shows that the text is available.  *Id.*

The preamble goes on to require that "a text source stores the text."  Prodigy housed its mainframe, "[t]he main computer complex for the PRODIGY service[,] in Westchester County, New York."  *See* Viescas Decl. ¶¶ 14-15; Dawley Decl. ¶¶ 7-9.  This mainframe stored the massive amount of data available to subscribers, including the books and other texts available for selection and transmission.  Viescas Decl. ¶ 14; Dawley Decl. ¶ 8.  The Prodigy mainframe constituted the "text source that stores the text."  Dawley Decl. ¶¶ 8, 11; Viescas Decl. ¶ 14.

### (b)    The *Prodigy Official Guide* Describes Claim 39's Preamble

The *Prodigy Official Guide* also discloses the elements recited in claim 39's preamble. As explained above, an article chosen by the subscriber constituted the selected text, and the subscriber's personal computer constituted the viewing location.  As the preceding section explains, for example, and Figures 4-27 and 4-28 from the *Prodigy Official Guide* show, "[w]hen [a Prodigy subscriber] saw [the title of an article] [he] want[ed], [the subscriber] [was] instructed to select it to see the article" on his or her personal computer.  Viescas Decl. Ex. 2 at 140.

Many other examples appear in the *Prodigy Official Guide*.  Figures 2-11 to 2-15 and their corresponding text in the *Prodigy Official Guide*, for instance, detail the process of how a Prodigy subscriber would receive selected text associated with the title of an available news article stored by the Prodigy mainframe when the subscriber was browsing the Newsroom.  *Id.* at 43-46.  Figure 2-15 illustrates a list of available book titles that could be demanded by the subscriber.



**Figure 2-15.**
*West area news menu.*

*Id.* at 46.  As shown in Figure 2-15, the subscriber could select an article – such as *Condor Egg Laid at LA Zoo Raises Hopes Birds May Someday Be Released Into Wild*" – which would be received at the subscriber's personal computer, *i.e.,* the "viewing location."  *Id.*

The *Prodigy Official Guide* also explains that to access Prodigy's content, subscribers had to be connected to Prodigy's network through the telephone lines.  Viescas Decl. Ex. 2 at 22-23.  That network included the "main computer complex for the PRODIGY service" located in Westchester County, New York.  *Id.*  This connection to the Prodigy main computer complex was necessary because that complex constituted the "text source [that] stores the text."

### b)      Prodigy Created a List of Titles of Available Books (Step 1)[10]

The first element of claim 39 requires the step of "creating a list of available books wherein a book is available if the text associated with the book is available for transmission."  Prodigy clearly satisfies this step.

---

[10]  The parties dispute the proper construction of the "list of titles . . . " term in this element.  For the reasons stated in its claim construction briefing and the May 21, 2010 hearing, Amazon's proposed construction is correct.  Nevertheless, because the asserted claims are invalid under Adrea's proposed claim constructions, for purposes of this Motion for Summary Judgment Amazon assumes that Adrea's proposed constructions have been adopted.  The asserted claims, thus, are invalid under Adrea's own proposed claim constructions.

### (a) The Prodigy Service Created a List of Titles of Available Books

Prodigy created a list of available books (articles), *i.e.,* articles that were available for Prodigy to transmit to a subscriber's personal computer.  Dawley Decl. ¶ 11; Viescas Decl. ¶¶ 31-52.  Numerous screen shots showing lists of available books that Prodigy created are discussed above and in the accompanying declarations.

For instance, Figure 2-15 shows a Prodigy screen that listed available news articles in the Los Angeles area; Figure 4-27 shows lists of articles available from the Prodigy Software Guide; Figure 4-32 shows lists of articles available from Prodigy's Parenting Guide; and Figure 4-46 shows lists of articles available from Prodigy's encyclopedia.



**Figure 2-15.**
*West area news menu.*



**Figure 4-27.**
*Entertainment software reviews.*



— Return to Parenting Topics window

**Figure 4-32.**
*Pre-Teen behavioral information articles.*



**Figure 4-46.**
*Encyclopedia article list.*

Viescas Decl. ¶¶ 36, 40, 44, 47; Dawley Decl. ¶¶ 13-14.

Prodigy created these lists to represent content that was available for transmission. Indeed, as Mr. Dawley explains in his declaration, the menus and lists of information displayed

by Prodigy were created based on actual content stored on the Prodigy mainframe and available for transmission. Dawley Decl. ¶¶ 11-12. These menus changed continuously to reflect updates to Prodigy's content. *Id.* As shown in Mr. Viescas's declaration and Figures 2-15, 4-27, 4-32, and 4-46, these lists of content represented titles whose text was available for transmission. Viescas Decl. ¶¶ 30-52.

### (b) The *Prodigy Official Guide* Describes Creating a List of Titles of Available Books

The *Prodigy Official Guide* also teaches creating a list of titles of available books. Each of Figures 2-15, 4-27, 4-32, and 4-46 above appear in the *Prodigy Official Guide*. These figures taken from the *Prodigy Official Guide* disclose that Prodigy created lists of available books. Viescas Decl. Ex. 2 at 46, 141, 145, 287. The *Prodigy Official Guide* also discloses that these lists represent titles whose text is available for transmission. For instance, the *Prodigy Official Guide* explains that these lists, and particularly the list for the "Headline" news, were continuously updated by Prodigy to ensure they contained titles of articles that were available for viewing; "each time [the subscriber] [would] return to [the menu listing all the top stories of the day], [the subscriber] may see new story headlines posted and old ones removed." *Id.* at 121. Thus, the *Prodigy Official Guide* disclosed that Prodigy created lists of available books.

### c) Prodigy Transmitted the List of Titles of Available Books (Step 2)

Claim 39's second element requires "transmitting the list of titles of available books." There can be no dispute that Prodigy transmitted a the list of available titles. And, in fact, in its discovery responses, Adrea did not even dispute that Prodigy satisfies this element.

### (a) The Prodigy Service Transmitted the List of Titles of Available Books

Prodigy transmitted the list of titles of available books to the subscriber's computer. As the screenshots above illustrate and the accompanying declarations explain, Prodigy transmitted lists of titles of a wide variety of textual material, constituting electronic books in the '690 patent. For example, Prodigy transmitted lists of titles of news articles in the Newsroom, encyclopedia articles in the Encyclopedia, and software review articles in the Software Guide,

among others, from the Prodigy mainframe for display on the subscriber's personal computer, *i.e.,* viewing location.  Dawley Decl. ¶¶ 10-13; Viescas Decl. ¶¶ 13-24.

To accomplish this transmission, Prodigy employed a distributed system whereby the Prodigy mainframe was connected to local Prodigy computers, or Local Site Computers ("LSCs"), which, in turn, connected to a subscriber's computer when the subscriber was logged on.  This system is shown in the figure below:



Dawley Decl. ¶¶ 7-9.  Thus, when a subscriber requested particular content, such as a list of titles or a menu, email, news story, or an encyclopedia article, the subscriber's personal computer would send a request to its LSC, which forwarded that request to the Prodigy mainframe; in response, the mainframe would send the relevant, requested data content to the LSC for transmission to the subscriber's personal computer.  Viescas Decl. ¶¶ 13-19; Dawley Decl. ¶¶ 7-14.  Upon arrival at a subscriber's computer, the data was loaded into the RAM (random access memory) of a subscriber's computer so the requested content could be displayed to the subscriber.  Viescas Decl. ¶ 18.

### (b)   The *Prodigy Official Guide* Describes Transmitting the List of Titles of Available Books

The *Prodigy Official Guide* also clearly describes that Prodigy transmitted a list of titles of available books.  Again, Figures 2-15, 4-27, 4-32, and 4-46 above are all actual screen shots from Prodigy that appear in the *Prodigy Official Guide.*  Viescas Decl. Ex. 2 at 43-46, 140-44, 157-58, 298.  These figures all show a list of titles that had been transmitted to the subscriber's computer by Prodigy.

The *Prodigy Official Guide* also explains how lists of titles are transmitted from the Prodigy mainframe to a subscriber's computer via modem. *Id.* at 6-7, 9. This also is illustrated by the set-up screen shot appearing on page 19 of the *Prodigy Official Guide.*



**Figure 1-4.**
*Macintosh install options confirmation screen.*

*Id.* at 19. Additionally, on pages 6 and 7, the *Prodigy Official Guide* explains that Prodigy's content is transmitted using compression techniques in order to decrease transmission time, and that during transmission, a "wristwatch symbol" or a "ticking clock face" was displayed on the subscriber's computer screen. *Id.* at 6-7.

### d) Prodigy Permitted Selection of Titles from Transmitted List of Titles (Step 3)

The third element of claim 39 requires "selecting a title from the transmitted list of titles." Again, there can be no genuine dispute that Prodigy satisfies this claim requirement; indeed, Adrea has not contested this point.

#### (a) The Prodigy Service Provided Selection of a Title from the Transmitted List of Titles

The Prodigy system satisfied the step of selecting a title from the transmitted list of titles. After Prodigy transmitted the list of titles of available books to the subscriber's computer, one of those titles was selected so that the text associated with that title could be transmitted to the subscriber for viewing. Dawley Decl. ¶¶ 10-14; Viescas Decl. ¶¶ 21-24. That is why, after all, Prodigy provided the lists of titles.

Prodigy provided several different ways by which titles could be selected.  For example, a Prodigy subscriber could highlight the title by "using the keyboard's up and down arrow keys to move a highlight bar or a 'box cursor' throughout the menu to illuminate the desired title. This is shown in Figure 2-11 below, where the "area news" option is highlighted with a "box cursor."



**Figure 2-11.**
*Guide pop-up: Newsroom, Area News.*



**Figure 2-15.**
*West area news screen.*

Viescas Decl. ¶¶ 23, 36.  In this way, a Prodigy user could select a title.

Alternatively, the Prodigy subscriber could select a title from the list of titles by using the keyboard to type the number associated with the chosen article in the menu or the first few letters of the title.  This is shown, for example, in Figure 2-15 above and explained in the Viescas declaration.  *Id.* at ¶ 36.  Indeed, as Mr. Viescas explains in his declaration at paragraph 23 and as the *Prodigy Official Guide* corroborates, the *Prodigy Official Guide* instructs:

> The next screen you see is a numbered selection list of all the types of information available about Los Angeles, as shown in Figure 2-14.  *Selecting items from this type of list is similar to selecting the numbered selections on the main Highlights screen – you select the item you want by pressing its number and then pressing Enter.*  You also can use the Tab or arrow keys or the mouse to make a selection. . . . Check out West News to see what's going on these days.  As you can see in Figure 2-15, on the day I looked, the top story was about a rare condor at the Los Angeles Zoo.  Of course, when you look here, you'll see a different list, but the items will be numbered for easy selection.

Viescas Decl. ¶ 23, Ex. 2 at 45 (emphasis added).  Additionally, a title from the transmitted list could be selected in Prodigy by moving the mouse's cursor icon over the article title on the screen.  Viescas Decl. ¶ 23.

Accordingly, titles from the transmitted list of titles clearly were selected as required by step 3 of claim 39 when using the Prodigy system.

### (b)   The *Prodigy Official Guide* Describes Selecting a Title from the Transmitted List of Titles

Each of the figures and text discussed in the preceding section appear in the *Prodigy Official Guide*.  These figures and text explicitly disclose selecting a title from the transmitted list of titles, as required by the "selecting" step of claim 39.

The *Prodigy Official Guide* contains further examples.  For instance, Figure 4-27 and its corresponding text describe not only selection of a title from the list of titles, but also *how* to select a title from the transmitted list of titles.  This is shown with respect to the Software Guide, for which the *Prodigy Official Guide* explains that a title can be selected by typing the first few letters of the title:

When you've set the criteria you want, select LIST SELECTED TITLES. You'll see a list of available articles for software that meets your criteria, similar to the list shown in Figure 4-27. You can page through the list using NEXT and BACK, or you can type letters in the input area above the list, then press Enter to move to the first entry that starts with the letters you typed. When you see an entry you want, select it to see the article.



**Figure 4-27.**
*Entertainment software reviews.*

Viescas Decl. Ex. 2 at 140, 33.  Thus, the *Prodigy Official Guide* explicitly discloses the step of selecting a title as required by claim 39.

### e)   Prodigy Communicated the Selected Title to Text Source (Step 4)

Prodigy also explicitly satisfies the fourth element of claim 39, which requires "communicating the selected title to the text source."  Adrea has never disputed this element, not could it given that Prodigy clearly transmits the text associated with each selected title to the user.

### (a)    Selected Titles Were Communicated to the Text Source in the Prodigy Service

Using Prodigy, after a title was selected from the transmitted list of titles, that selection was communicated to the Prodigy mainframe, or the text source, as required by claim 39, so that the text associated with a title could ultimately be transmitted to the subscriber's personal computer.  This is how Prodigy transmitted text on demand.

As previously explained with respect to the step of transmitting the list of titles to the subscriber (step 2), Prodigy "communicated" the selected title by having the subscriber's personal computer send a request to the LSC to which it was connected; the LSC forwarded that request for information to the Prodigy mainframe.  Viescas Decl. ¶¶ 13-19; Dawley Decl. ¶¶ 7-14.  Thus, for example, when the title "Microsoft Flight Simulatr 3.0" was selected from the list of available articles in the Software Guide, or the title "Condor Egg Laid at LA Zoo Raises Hopes Birds May Someday Be Released into Wild" was selected from the West News category of the Newsroom, the subscriber's personal computer communicated the selection of that title to the Prodigy mainframe through an LSC.  Viescas Decl. ¶¶ 16-17, 23-24, 36-37, 41; Dawley Decl. ¶¶ 10-12, 14.

Thus, the selected title was communicated using Prodigy.  And, in this way, Prodigy knew what text had been selected so it would know what text to transmit.  Viescas Decl. ¶¶ 16-17, 23-24, 36-37, 41; Dawley Decl. ¶¶ 10-12, 14.

### (b)    *The Prodigy Official Guide* Describes Communicating Selected Titles to the Text Source

*The Prodigy Official Guide* also explicitly discloses that a subscriber's selection of a title from the list of titles was communicated to the Prodigy mainframe.  It explains that the user will select a title and that that selection will be communicated with Prodigy, so that Prodigy can be advised what text to deliver (*i.e.,* transmit) to the user.  For example, the *Prodigy Official Guide* includes several pages of explanation regarding the need for a modem and configuring the modem so the subscriber's computer could communicate with the Prodigy network in order to, among other things, communicate the user's selection.  *See, e.g.,* Viescas Decl., Ex. 2 at 4-7, 10-

28

11, Figs. 1-1, 1-2. The *Prodigy Official Guide* thus teaches that the selected title is communicated to the text source as required by claim 39.

### f) Prodigy Transmitted the Text Associated with the Selected Title from the Text Source to the Viewing Location (Step 5)

The final element of claim 39 requires "transmitting the text associated with the selected title from the text source to the viewing location." This step indisputably was performed by Prodigy, and disclosed in the *Prodigy Official Guide*. In fact, this is how the subscriber received the selected text – because Prodigy Prodigy transmitted that text to the subscriber's computer.

### (a) The Prodigy Service Transmitted the Text Associated with the Selected Title from the Text Source to the Viewing Location

Prodigy performed the final step of claim 39 by transmitting text associated with the selected title from the text source to the subscriber's personal computer – the "viewing location." As noted above, Prodigy's content, such as the full text of the articles listed in menus, was stored on the Prodigy mainframe. Dawley Decl. ¶ 7. The Prodigy mainframe, *i.e.,* the text source, sent the text corresponding to the selected title to the LSC, or local Prodigy computer, which forwarded the text to the subscriber's computer. *Id.* at ¶¶ 7-14; *see also* Viescas Decl. ¶¶ 13-17. In this way, Prodigy transmitted the text to the viewing location.

Thus, for example, when a subscriber selected the title "Microsoft Flight Simultr 3.0" from the list of available articles in the Prodigy Software Guide, the article text corresponding with that title was transmitted from the Prodigy mainframe to the subscriber's viewing location, such as his or her personal computer.



**Figure 4-27.**
*Entertainment software reviews.*



**Figure 4-28.**
*Software Guide article.*

29

Viescas Decl. ¶¶ 16-17, 23-24, 41; Dawley Decl. ¶¶ 10-12, 14.  Similarly, when a subscriber selected an encyclopedia article about the poet Emily Dickinson, Prodigy transmitted the text associated with the article to the subscriber's computer.



**Figure 4-46.**
*Encyclopedia article list.*

**Figure 4-47.**
*Emily Dickinson article.*

*Id.*  And when a title was selected from Prodigy's Parenting Guide, Prodigy transmitted the text associated with that title to the subscriber's computer.




**Figure 4-32.**
*Pre-Teen behavioral information articles.*

**Figure 4-33.**
*Allowance advice.*

*Id.*  Thus, the Prodigy system clearly performed the final step of claim 39 by "transmitting the text associated with the selected title from the text source to the viewing location."

> **(b)**     ***The Prodigy Official Guide* Describes Transmitting Text Associated with the Selected Title from the Text Source to the Viewing Location**

As demonstrated above, the *Prodigy Official Guide* also discloses that the text associated with the selected title was transmitted from the text source to the viewing location.  *See, e.g.,* Viescas Decl. Ex. 2 at 140-41.

The *Prodigy Official Guide* explained – and clearly showed – that once an article title was selected, the text associated with that title – such as the "Microsoft Flight Simultr 3.0" article, or the "Emily Dickinson" encyclopedia article, or the "Allowances" article – would be transmitted to the Prodigy subscriber's computer, where it was displayed for the Prodigy subscriber to read. *Id.* at 140-41, 144-45, 156-58; Figs. 4-28, 4-33, 4-47.

*       *       *

Thus, both the Prodigy system and the *Prodigy Official Guide* satisfy every one of the elements of claim 39 of the '690 patent, and as a result both the Prodigy system and the *Prodigy Official Guide* separately and independently invalidate claim 39.

### 3.    Prodigy Anticipates Claim 40

The Prodigy system and the *Prodigy Official Guide* also separately and independently invalidate dependent claim 40 of the '690 patent.  In fact, in its discovery responses, Adrea did not contend that a single element of claim 40 is missing from Prodigy.  This is not surprising considering that Prodigy so clearly did perform the steps of claim 40.

Claim 40 simply adds steps related to organizing the available books by categories, and allowing for selection of a title from a category.  Given the large amount of information available on Prodigy, Prodigy necessarily had to organize that information by category.  Perhaps one of the clearest examples of such categorization appeared in the Newsroom, as shown below:



**Figure 2-11.**
*Guide pop-up: Newsroom, Area News.*

Viescas Decl. ¶¶ 32-34, Ex. 2 at 44.  The Newsroom, as described in the *Prodigy Official Guide* and as used by Prodigy subscribers, categorized the news by "news desk," "headlines," "quick

31

news," "area news," etc.  *Id.* at ¶¶ 32-34, Ex. 2 at 43-46.  Prodigy used similar categories in its

other article collections.  *Id.* at ¶¶ 38-52, Ex. 2 at 43-46, 140-44, 157-58, 298.  In the *Parenting*

*Guide*, Prodigy organized its articles about children by their age (*e.g.*, Infant, Pre-Teen, or Teen),

and then by subject matter (*e.g.,* behavioral, educational, or medical information).  *Id.* at ¶¶ 45-

48, Ex. 2 at 144.  The *Software Guide* was similarly organized and, for example, categorized its

articles by the type of software being described.  *Id.* at ¶¶ 38-41, Ex. 2 at 139-40.

As demonstrated below, Prodigy not only categorized information, but it did so in exactly

the way set forth in claim 40 and therefore invalidates claim 40.

### a) Prodigy Generated Menu that Listed Categories of Available Books (Step 1)

The first element of claim 40 requires "generating a menu which lists categories of

available books."  Prodigy generated such a menu.

### (a) The Prodigy Service Generated a Menu that Listed Categories of Available Books

The Prodigy system generated menus that listed categories of available books.  As the

Newsroom example of Figure 2-11 above demonstrates, Prodigy generated a menu that listed the

categories of available articles (books).  Viescas Decl. ¶¶ 21-24, 34-36; Dawley Decl. ¶¶ 10-14.

Subscribers browsing the Newsroom navigated through a series of menus and sub-menus

to choose from lists of increasingly specific categories of available articles, *e.g.,* articles relating

to the Western United States, and then, more specifically, Los Angeles, California.



**Figure 2-12.**
*Area News pop-up menu.*



**Figure 2-13.**
*West area cities pop-up menu.*



**Figure 2-14.**
*Los Angeles area information list.*

Viescas Decl. ¶¶ 34-36.  Thus, the Prodigy system satisfies this claim element.

**(b)      The *Prodigy Official Guide* Describes Generating a
Menu that Listed Categories of Available Books**

The *Prodigy Official Guide* also explicitly discloses that Prodigy generated a menu that

listed categories of available books.  As the figures above show, the *Prodigy Official Guide*

disclosed the generation of menus that listed categories of available books.  Viescas Decl. Ex. 2

at 43-46, Figs. 2-11 to 2-15.  According to the *Prodigy Official Guide,* these menus, including

the menus utilized in the Newsroom, listed the categories of available articles from which a

Prodigy subscriber could choose a category and then view a list of the available articles in that

category.  *Id.* at 6-7, 43-46, 123.

**b)      Prodigy Provided Choosing a Category of Available Books
from the Generated Menu (Step 2)**

The second element of claim 40 requires the step of "choosing a category of available

books from the generated menu."  Prodigy also clearly satisfies this element.

**(a)      The Prodigy Service Provided Choosing a Category of
Available Books from the Generated Menu**

Using Prodigy, users were able to choose a category of available books from the menu

that listed categories of available books.  This was one of the features and benefits of Prodigy.

For instance, continuing with the Newsroom example, Figures 2-12 to 2-14 above demonstrate

how a category of available books was chosen from the menu of categories.  Viescas Decl.

¶¶ 21-24, 34-36; *see also* Dawley Decl. ¶¶ 10-14.  In particular, these Figures depict the

experience of a subscriber who, while browsing the Newsroom, first chose the category of

articles about "West News" from the menu, and then within that category the sub-category of

articles about "Los Angeles" news.  Viescas Decl. ¶¶ 34-37.  Figures 2-12 and 2-13 demonstrate

the subscriber choosing these categories with the highlighted cursor boxes.  *Id.*

**(b)      *The Prodigy Official Guide* Describes Choosing a
Category of Available Books from the Generated Menu**

Similarly, the *Prodigy Official Guide* discloses choosing a category of available books

from the generated menu.  The *Prodigy Official Guide* provides detailed instructions on how to

choose a category from the menu of categories in the Newsroom when presented with the menu

33

of categories depicted in Figure 2-14.  This includes, for example, "pressing [the number of the category you want] and then pressing Enter.  [The subscriber] can also use the Tab or arrow keys or the mouse to make a selection."  Viescas Decl. Ex. 2 at 45.  Similarly, the *Prodigy Official Guide* instructs a user browsing the Parenting Guide that, "[i]f [they] select Pre-Teen from the Parenting Guide pop-up menu and then select Behavioral and Information from the subsequent pop-up menus,  [they]'ll see a list of topics. . . .Select Allowances, the first topic in this area, and [they]'ll see an article by Vicki Lansky."  *Id.* at 144-45.

<b>c)     Prodigy Listed Books within Chosen Category of Available Books (Step 3)</b>

Finally, claim 40 requires "listing books within the chosen category of available books." This element is satisfied by both the Prodigy system and the *Prodigy Official Guide*.

<b>(a)     The Prodigy Service Listed Books within the Chosen Category of Available Books</b>

As discussed above, once a specific category was chosen from a menu, Prodigy listed for the subscriber the available articles (books) contained within the chosen category.  Dawley Decl. ¶¶ 7-8, 10-14; Viescas Decl. ¶¶ 13-16, 18, 21-24, 35-37, 47.  Because the user would be provided a list of books with the chosen category, the user could then select a particular book from the list of books in that chosen category.

For instance, with respect to the Newsroom example, once the user browsing the Newsroom reached the menu for West News, or news about Los Angeles, Prodigy listed the articles available in that category.



**Figure 2-15.**
*West area news menu.*

34

Viescas Decl. ¶¶ 35-37.

Thus, the Prodigy system clearly performed the step of listing books in the particular chosen category.

### (b) *The Prodigy Official Guide* Describes Listing Books within the Chosen Category of Available Books

*The Prodigy Official Guide* also discloses that available books in a category were listed when that category was chosen.  This is described and shown explicitly in the Guide.

For example, according to the *Prodigy Official Guide,* "[a]fter [the subscriber] [had] selected a category (and possibly a subcategory), [the subscriber] [would] see an article list." Viescas Decl. Ex. 2 at 44, 298.  The *Prodigy Official Guide* teaches that this list changed in order to reflect the articles that are available, informing the *Prodigy Official Guide*'s reader that he or she would see a different list of available article titles when he or she browsed the Los Angeles news articles from the list depicted in the *Prodigy Official Guide.  Id.* at 45.  Thus, the Guide also discloses this element of claim 40.

As publicly used and described in *the Prodigy Official Guide,* Prodigy thus listed books, or "topics," within a chosen category of available topics.

\*       \*       \*

Thus, both Prodigy and the *Prodigy Official Guide* satisfies every one of the elements of claim 40 of the '690 patent, and as a result both the Prodigy system and the *Prodigy Official Guide* separately and independently invalidate claim 40.

## IV.  CONCLUSION

No material issue of genuine fact exists with respect to Prodigy's operation and features or the dates such operation and those features were available.  Neither does a genuine issue of material fact exist with respect to what the *Prodigy Official Guide* describes or the date it was published.  Amazon therefore respectfully requests that the Court grant summary judgment that claims 39 and 40 of the '690 patent are invalid as anticipated by (1) the public use of the Prodigy system and (2) the *Prodigy Official Guide* printed publication pursuant to 35 U.S.C. § 102(b).

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt
Y. Ernest Hsin
Sarah E. Piepmeier
200 Park Ave
New York, NY 10166
(212) 351-4000

Mark Reiter
2100 McKinney Avenue
Dallas, TX 75201-6912
(214) 698-3100


Dated:  December 16, 2010

POTTER ANDERSON & CORROON LLP

By:  ___/s/ *David E. Moore*_____
         Richard L. Horwitz (No. 2246)
         David E. Moore (No. 3983)
         Hercules Plaza, 6th Floor
         1313 North Market Street
         Wilmington, Delaware 19801
         (302) 984-6000
         rhorwitz@potteranderson.com
         dmoore@potteranderson.com

*Attorneys for Amazon.com Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I,  David E. Moore, hereby certify that on December 16, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on December 16, 2010, the attached document was Electronically Mailed to the following person(s):

Elena C. Norman
Jeffrey T. Castellano
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE  19899-2207
enorman@ycst.com
jcastellano@ycst.com

Michael A. Jacobs
Deok Keun Matthew Ahn
Patrick J. Zhang
Richard S.J. Hung
Brooks M. Beard
Morrison & Foerster LLP
425 Market Street
San Francisco, CA  94105-2482
mjacobs@mofo.com
dahn@mofo.com
rhung@mofo.com
pzhang@mofo.com
bbeard@mofo.com

Brent P. Lorimer
Sterling A. Brennan
L. Rex Sears
Seth W. Black
Workman Nydegger
1000 Eagle Gate Tower
60 E. South Temple
Salt Lake City, UT  84111
blorimer@wnlaw.com
sbrennan@wnlaw.com
rsears@wnlaw.com
sblack@wnlaw.com

_/s/ David E. Moore_
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

916443 / 34137